UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

FRANKLIN COMMUNITY ADVOCATES, INC., *et al.*,

        Plaintiffs,

                          Case No. 22-cv-413-pp

    v.

CITY OF FRANKLIN,

        Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF STANDING (DKT. NO. 17) AND DISMISSING CASE**

---

On April 2, 2022, the plaintiffs filed a complaint alleging that the defendants violated their due process and equal protection rights. Dkt. No. 1. Three weeks later, the defendants filed a motion to dismiss the complaint. Dkt. No. 7. Three weeks after that, on May 17, 2022, the plaintiffs filed an amended complaint. Dkt. No. 14. The amended complaint, now operative, asserts three claims: (1) violation of substantive due process, (2) intentional violation of right to equal protection and (3) a Fifth Amendment taking contrary to public purpose. Id. The defendant since has filed a motion to dismiss the amended complaint, dkt. no. 17, which the plaintiffs oppose, dkt. no. 24. The court will grant the motion.

## I.    Background

The amended complaint summarizes the factual basis underlying the plaintiffs' claims as follows:

> This is a challenge to the actions of the City of Franklin and its officials regarding misuse of the City's authority under state and federal law to award public funds and subsidy to preferred and

1

favored private property owners in the City and in so doing intentionally or with reckless disregard cause direct economic injury to the taxpayers of the City and in particular plaintiffs who own property adjacent and near the site of a proposed 152,000 SF slaughterhouse facility. The City, through its officials, has repeatedly misrepresented the factual basis and purpose of making governmental decisions including in particular rezoning and land use determinations and the establishment of Tax Incremental Districts [(TID)]. This has included the borrowing of public funds and the use of those funds to build certain infrastructure for the sole benefit of private favored landowners and with the knowledge that doing so would be detrimental to and negatively impact the value and use and enjoyment of the private property of Plaintiffs. The result of this has been to favor one set of taxpayers and property owners, the developers within the TID, and directly and knowingly injure another set of tax payers, those that own property on the boundary of and surrounding the TID. The underlying intent and motive of the City and its officials' actions is in fact unrelated to and unsupportive of any legitimate public purpose and raises the inference that governmental actions and decision, and the use of governmental power and authority, was used to benefit public officials in their personal capacities.

Dkt. No. 14 at ¶1.

A.    The Parties

The plaintiffs include a community advocate organization (Franklin Community Advocates, Inc.), two homeowners associations (Woodlake Village Homeowners Association and Champions Village Homeowners Association), a community association (Stonebridge Community Association) and nine sets of homeowners. Id. at ¶¶2-15.

The community advocate organization, Franklin Community Advocates, Inc. (FCA) is a non-profit corporation established under Wis. Stat. §181 et seq. Id. at ¶2. The plaintiffs allege that "all its fellow Franklin Plaintiffs" also are members. Id.

The two homeowners' associations are Woodlake Village Homeowners Association (Woodlake) and Champions Village Homeowners Association

2

(Champions). Id. at ¶¶3, 11. Woodlake's president, Dave Sorensen, is a member of FCA. Id. at ¶3. Woodlake represents and acts on behalf of its members, sixty residential properties approximately 1.6 miles northeast of the proposed meat processing facility. Id. Woodlake alleges that development of the slaughterhouse and the TID will disrupt its members' quiet enjoyment and value of their properties. Id. Champions, led by its president, Stephen Van Goethem, represents 200 households within a mile of the proposed slaughterhouse and other property within the TID. Id. at ¶11. Champions alleges that the homes of its members will face a loss of property value from further development of the TID, specifically the slaughterhouse. Id. Both HOAs have joined as plaintiffs on behalf of their members. Id. at ¶¶3, 11.

The Stonebridge Community Association (Stonebridge) is an association of homeowners and taxpayers within a mile of the TID, including the proposed slaughterhouse. Id. at ¶12. Led by its president, Russell Anderson, Stonebridge represents thirty-eight households that will be affected by further development of the TID and the slaughterhouse, specifically by diminishing property values. Id. Stonebridge has joined as a plaintiff on behalf of its members. Id.

Thirteen sets of homeowners also have joined the case as plaintiffs:

- Chad and Karyn Zolecki own and pay taxes on the property located at 11763 West Loomis Road in Franklin, Wisconsin. Id. at ¶4. They are members of FCA and their property is within a third of a mile from the proposed meat processing facility. Id. The Zoleckis allege that further development of the TID "will intrude and disrupt the quiet enjoyment of, dimmish the value of, and cause direct and material injury and harm to their private residential property." Id.

- Jeff and Danielle Kenney own and pay taxes on the property located at 12302 West Loomis Court in Franklin, Wisconsin. Id. at ¶5. They are members of FCA and their property is located within a third of a mile from the proposed slaughterhouse. Id. They allege harm to the quiet enjoyment and value of their property. Id.

3

- Ryan and Rachel Ringwelski own and pay taxes on the property located at 11838 West Ryan Road in Franklin, Wisconsin. Id. at ¶6. They are members of FCA and their property is located within a third of a mile from the proposed slaughterhouse. Id. They allege harm to the quiet enjoyment and value of their property. Id.

- Nick and Maggie Poplar own and pay taxes on the property located at 11856 West Ryan Road in Franklin, Wisconsin. Id. at ¶7. They are members of FCA and their property is located within a third of a mile from the proposed slaughterhouse. Id. They allege harm to the quiet enjoyment and value of their property. Id.

- Tom and Alice Benning own and pay taxes on the property located at 11720 West Ryan Road in Franklin, Wisconsin. Id. at ¶8. They are members of FCA and their property is located within a third of a mile from the proposed slaughterhouse. Id. They allege harm to the quiet enjoyment and value of their property. Id.

- Mike and Joanne Zolecki own and pay taxes on the property located at 11835 West Ryan Road in Franklin, Wisconsin. Id. at ¶9. They are members of FCA and their property is located within a third of a mile from the proposed slaughterhouse. Id. They allege harm to the quiet enjoyment and value of their property. Id.

- Eric and Michelle Balcerowski own and pay taxes on the property located at 11720 West Ryan Road in Franklin, Wisconsin.[1] Id. at ¶10. They are members of FCA and their property is located within a third of a mile from the proposed slaughterhouse. Id. They allege harm to the quiet enjoyment and value of their property. Id.

- Frank and Cheri Cistaro own and pay taxes on the property located at S96 WI3205 Linksway Court in Muskego, Wisconsin. Id. at ¶13. Their property is located within a mile of the proposed slaughterhouse. They allege harm to the quiet enjoyment and value of their property. Id.

- Stephen and Pamela Grande own and pay taxes on the property located at S97 W13656 Stonebridge Way in Muskego, Wisconsin. Id. at ¶14. Their property is located within a mile of the proposed slaughterhouse. They allege harm to the quiet enjoyment and value of their property. Id.

---

[1] This is the same address as the Bennings'.

4

The plaintiffs allege that the defendant is a municipal and governmental body operating under Wisconsin law. Id. at ¶15.

B.    Underlying Facts

    1.    *Early Development to Adoption*

The plaintiffs allege that the defendant put together a comprehensive development plan in 2009. Id. at ¶17. They say that in 2014, based on that plan, officials of the defendant decided to focus on encouraging development in three geographic areas within the city, including the Loomis Road corridor between Ryan Road and the border with the city of Muskego. Id. The plaintiffs say that developer Bear Development initially was "made privy to" the plan to encouragement development in this area. Id. They allege that Bear Development purchased 164 acres of land, covering most of the proposed development corridor, in August 2016. Id. at ¶18. They say that representatives of Bear stated at the time that "there is demand for both single and multi-family housing in Franklin, . . . plus the potential for retail or business park space." Id.

The plaintiffs allege that the defendant produced an aerial plan for the land the following year (2017). Id. at ¶19. They explain that this initial plan depicted what the proposed development would look like, focusing on new residential development "in keeping with the existing surrounding uses and the nature of the lands in the area" as well as small businesses and commercial developments. Id.

The plaintiffs allege that in 2018, the mayor began finalizing his "true plans" in private discussions with Bear Development and Strauss Brands (a mid-sized local business). Id. at ¶20. The plaintiffs say the true plan was "to create an off the books agreement to develop a 152,000 square foot

5

slaughterhouse, with an approved additional 130,000 square foot expansion on land in this Loomis Road corridor." Id. They assert that this alleged plan was not reflected in the second aerial graphic of the area, which the plaintiffs argue did not include any mention of a "giant" slaughterhouse or other heavy industrial facilities. Id. at ¶21. They contend that the area then was named the Loomis Business Park and that a thirty-acre parcel "was to be created for a supposed 'manufacturer' with whom Bear Development was in active discussions to be a tenant for the new business park." Id. The plaintiffs assert that the same year—2018—the defendant began establishing a TID to cover the business park. Id. at ¶22.

According to the plaintiffs, the defendant hired a consultant "to generate a study and analysis ostensibly supporting the creation and adoption of the TID district . . . to be titled TID 6." Id. at ¶23. The analysis allegedly stated that "the use of public funds, which would be money borrowed by the [defendant] from the private market, to build roads and other infrastructure in TID 6 was necessary and appropriate and complied with the State law requirements to allow the use of such public funds." Id. at ¶24. The plaintiffs allege that the consultant stated that the development would result in a higher tax base for the defendant. Id. at ¶26. The consultant also allegedly stated that the development would include seventy-nine residential homes available to the workers who would be employed in the TID. Id. at ¶28.

The plaintiffs disagree with this analysis and assert that the TID met none of the three legal requirements for its creation. Id. at ¶24. They say the defendant failed: (1) "to state how farmland and protected wetlands could possibly be considered 'blighted,'" (2) "to clarify how land already owed by a developer, with plans for residential development in place, could possibly be

6

considered otherwise 'undevelopable' without or but for TIF financing," (3) to "acknowledge that a side agreement was already in place to create a giant slaughterhouse on the land," (4) to acknowledge or discuss in public that the 152,000 SF first phase of the new slaughterhouse would not benefit the entire community and in fact would have the opposite affect by creating something undesirable and a likely noise and odor nuisance" and (5) to "acknowledge that the proposed development would actually lower surrounding property values but instead suggested and stated it would not." Id. at ¶25. The plaintiffs assert that their own expert analysis shows a negative impact on surrounding property values from the proposed slaughterhouse. Id. (citing dkt. no. 1-4). The plaintiffs also challenge the determination that the proposed development would increase the defendant's tax base, insisting the consultant did not acknowledge that the benefit from the increase would not reach the "taxpayers and property owners of property lying just outside TID 6 and generally in the City" for up to twenty years while the private property owners involved in the development of TID 6 would see immediate substantial benefits and financial gains. Id. at ¶26. They also disagree with the statement regarding the seventy-nine proposed homes providing housing opportunities for anticipated workers, arguing that the majority of the positions would be involved in the slaughtering process and pay $14-17 per hour, which would preclude those workers from purchasing or renting the TID 6 homes (which had starting prices of $500,000). Id. at ¶29.

The plaintiffs allege that the defendant made "certain statements" about the future use of the property during the review phase, as did Bear Development. Id. at ¶27. They say that Bear made such statements through its president, representing that the development would be residential and that

Bear was in talks with a manufacturer "to fill a new building on about 30 acres." Id. The plaintiffs say that the defendant knew that the manufacturer was, in fact, Strauss Brands, which they say does not qualify "under the business designation of a manufacturer." Id. They also say that the identity of the company was kept from the public because it would have been unpopular with the community. Id. (citing Dkt. No. 1-5).

The plaintiffs allege that the property in the TID was not blighted or otherwise limited or of a character under Wis. Stat. §66.1105 that would justify inclusion in a TID. Id. at ¶30. They say that Bear purchased the land and began to plan a subdivision over a year before the adoption of TID 6 and that the defendant reviewed and adopted the TID in fall 2018 despite the alleged qualification problems. Id. at ¶¶30-31. The plaintiffs allege that the defendant "did so knowing that the TID was not needed to allow for the development that had already begun in the area and also knowing that the TID was contrary to the intent of the TID/TIF law and the underlying redevelopment statutes in Wisconsin and not for a genuine public purpose." Id. at ¶31. They add that most of the defendant's meetings about the TID were held in closed session but that Bear and Strauss privately were kept in the loop throughout the process. Id. at ¶32.

## 2. *Post-Adoption*

After adopting the TID, the defendant allegedly continued making decisions that benefited private property owners at the expense of the plaintiffs and other taxpayers. Id. at ¶33. The plaintiffs allege that the benefits to Bear included the ability to sell thirty acres of property to Strauss in March 2019 for $2.1 million when it had purchased all 164 acres of the property for $710,000 two years earlier. Id. at ¶34. As for Strauss, the plaintiffs say the defendant

promised large amounts of water for the slaughterhouse and agreed to "very limited or no restrictions on the volume of 'meat harvesting' at the site." Id. at ¶35. They also say the defendant attached the specific use permit to the property, rather than the applicant, which is atypical and makes the land more valuable and easier to sell. Id. They allege that the mayor promised Strauss that it would be approved to build the 152,000 square foot slaughterhouse in TID 6, regardless of ordinance requirements. Id. at ¶36. This promise allegedly came to fruition when the defendant and Strauss entered into a contract in 2019 "whereby the [defendant] in effect promised to approve any permits necessary to allow Strauss to contract its new slaughterhouse, in exchange for a minimum tax guarantee." Id. at ¶37. The plaintiffs allege that this exchange presented a direct conflict for the defendant because the minimum tax payments were due the defendant only if the slaughterhouse project was granted certain permits and constructed, but the defendant was the party in charge of authorizing the permits. Id. at ¶38.

The plaintiffs say that these issues were not presented to the public at city council meetings and that the defendant suggested that the slaughterhouse would be "consistent with the uses required by the [defendant's] Comprehensive Plan and otherwise." Id. at ¶39. They allege that residents did not find out about the Strauss deal until at least late 2019, after Strauss sought a better deal with the city of Milwaukee and "[the defendant's] mayor began making public statements" about the new slaughterhouse project, calling it a "done deal." Id. at ¶¶40-41. The plaintiffs say this was before Strauss even had applied for a specific use permit. Id. at ¶41. They allege that the defendant rezoned the property and created a TID in an area that had not historically been used for industrial purposes. Id. at ¶42. They allege that the

surrounding properties are "either unimproved, conservancy, or residential in nature." Id. The plaintiffs contend that if the slaughterhouse project under TID 6 is allowed to continue, the individual residential properties they own will suffer diminution, likely in the range of $35,000 to $160,000, based on the current estimated Zillow value for each house. Id. at ¶43. They allege that the defendant will lose a total of $7,369,946 in property value and tax base, and that the city of Muskego is expected to lose $14,243,680, if the slaughterhouse is built in the currently proposed location. Id. at ¶43 (citing dkt. no. 1-4).

The plaintiffs allege that the meetings between the defendant and Strauss from October 2019 through Spring 2020 regarding the slaughterhouse were private or otherwise unrecorded. Id. at ¶44. The project allegedly was not made public until spring 2020, after which point Strauss finally applied for its permits on April 15, 2020 with limited supporting documents. Id. at ¶¶45-46. Strauss filed an amended application on July 29, 2020, increasing the size of the proposed facility. Id. at ¶45. Information about the final Strauss development was provided to the public, including the plaintiffs, only in summer 2020. Id. at ¶50.

The plaintiffs allege that the information presented by Strauss at the meetings with the defendant was not accurate, nor was some of the information contained in its permitting application, including:

> (i) Misrepresenting whether cattle will be killed on the site, and what the eventual volume of meat harvesting is intended to be—the application calls for a "kill floor"

> (ii) No requirements for job creation

> (iii) Claims that local residents will be employed—3 Franklin residents are the most ever employed by Strauss at anyone [sic] given time

(iv) Exaggerations and inconsistent assertions and statements on the cost of the project

(v) Inaccurate and unsupported predictions on the increase in tax base that would result from the construction of the project at the subject property.

Id. at ¶47. They also allege that the defendant's mayor and select alderpersons conveyed information at the meetings that was prejudicial, a conflict of interest and false, including:

(i) Statements that Strauss is a locally owned, family company—Strauss is owned by an investment firm in Texas;

(ii) Statements that Strauss put limited burden on the police department—over the course of 6 years, more than 100 calls had been responded to by police at the current Strauss facility, some as significant as involving firearms and death threats;

(iii) The Mayor stated he was unaware of any complaints filed against Strauss, although he was copied on an email regarding the latest noise complaint from one of the neighbors near the existing, much smaller facility, and was aware of OSHA complaints, DNR violations, MMSD violations, USDA violations causing a 2 day shutdown and unpermitted construction issues with both their site as well as their current building.

Id. at ¶48. The plaintiffs assert that the provision of false information was done knowingly and intentionally, because the defendant and Strauss privately agreed that although development of the slaughterhouse would be detrimental to the quiet enjoyment and value of the nearby residential properties (including the plaintiffs'), their public statements would "assert otherwise." Id. at ¶49.

The plaintiffs say the mayor stated back in September 2019 in the Milwaukee Business Journal that the deal with Straus was done, id. at ¶52 (citing Dkt. No. 1-6), and that Strauss was a "good corporate citizen," even though he knew that Straus's existing facility within the city had recently settled with OSHA for $260,000 and been closed down for several days by the USDA for inhumane handling of animals, id. at ¶53 (citing Dkt. Nos. 1-7, 1-8).

11

They allege that the mayor incorrectly stated that there had only been eight police incidents at the existing Strauss facility when public records show that there were over 150 such incidents over the previous six years. Id. at ¶54 (citing Dkt. No. 1-12). They allege that the mayor disparaged and criticized residents who objected to the proposed slaughterhouse and "[i]n one public post . . . stated that he would tell the Franklin Police Department to 'stand down' if a protest took place at the home of another alder who was known to be against the project and the process that had occurred to approve it." Id. at ¶55.

The city council ultimately approved Strauss's permit—over allegedly "massive protest and objection"—after initially denying it four votes to two on October 20, 2020. Id. at ¶56. The plaintiffs assert that this occurred only after "the Mayor and his staff were not going to accept the result" and orchestrated reconsideration of the initial vote. Id. At a meeting on November 2, 2020, a single alderperson switched her vote, causing a three-to-three tie which was broken by the mayor's deciding vote. Id. at ¶57.

The plaintiffs say they filed a case in state court "regarding the lack of merit of the special permit approved by the [defendant] at the November 2, 2020 meeting." Id. at ¶58. They say that in the months before they filed this federal suit, further information came to light surrounding what the defendant and the mayor knew about the harms to taxpayers and private property owners in the community from development of the proposed slaughterhouse. Id. at ¶59. The plaintiffs insist that this newly public information "shows that the Mayor took steps behind the scenes to intentionally alter the proper process of review and approval of the slaughterhouse." Id. at ¶60. The plaintiffs include in the amended complaint several paragraphs from an affidavit written by a former engineer for the defendant, which states:

5.    Mayor Olson has acted as the Chair of the PC during my tenure. At PC meetings I was required to attend, I was instructed how to vote, regardless of my professional opinion, or lack of knowledge on a particular item.

6.    When the Agenda was cut and dry with no controversial items, the Engineering seat on the PC was permitted to be vacant so long as a quorum could be reached. When controversial items were on the Agenda and the Engineering vote was possibly required to pass an item, either the City Engineer or I was required to attend. This is what occurred prior to the Strauss SUP. The week prior to the PC meeting the City Engineer requested me to cover the meeting, as he had approved vacation for that time. I also had approved vacation during the same period, so I told him I could not. Mayor Olson then revoked my boss' vacation, to make sure someone was present to steer the desired outcome.

Id. at ¶61. The plaintiffs allege that another former employee was ostracized and left her position with the defendant because of the mayor's hostility toward her as a result of her objection to the slaughterhouse project. Id. at ¶62.

            3.    *Recent Developments*

The plaintiffs assert that the state court ordered the defendant to hold new hearings on the slaughterhouse special permit "to ensure that adequate due process was provided to the citizens and [sic] including plaintiffs." Id. at ¶63. On the day of the new hearing at the city planning commission, Strauss submitted a letter withdrawing from the project. Id. at ¶64. The plaintiffs believe that Strauss's intentions to withdraw were known for some time, although they do not say by whom. Id. (citing Dkt. Nos. 1-9 and 1-10). The plaintiffs assert that the defendant's staff and "a bare majority" of the common council proceeded with the hearing anyway and reaffirmed their approval of the permit two weeks later, even though the applicant for the special use permit had withdrawn its application. Id. at ¶¶65-66. The plaintiffs assert that "[t]he new hearings were ordered and intended to provide due process but were instead used by the [defendant] to provide even less due process or

transparency." Id. at ¶66. They argue that in the absence of an actual applicant, the defendant essentially became the "applicant and the regulator for the same matter and put itself in an irreconcilable conflict." Id.

The plaintiffs filed their federal complaint, after which they say further investigation revealed additional facts "showing the improper intent of the City's action to establish TID 6 and to try to force the development of a massive slaughterhouse in the heart of that district." Id. at ¶67. They allege that wastewater from the slaughterhouse would be directed into a sewer known as the "Ryan Creek Interceptor" (RCI), which was funded in large part by publicly obtained funds from the state of Wisconsin and "other sources." Id. at ¶¶68-69. According to the plaintiffs, the funds and the RCI were available to the defendant only "if it promised and represented that the capacity that would be made available from the RCI would not be used for future growth and development." Id. at ¶70. The plaintiffs say the defendant provided those assurances even though it knew that it would use the RCI for private developments. Id. at ¶71.

The plaintiffs assert that the RCI has been mostly unused since its construction. Id. at ¶72. They assert that this caused a buildup of methane gas, which required costly mitigation and remediation as the gas built up in homes that the city had forced to connect to the RCI under existing state laws. Id. The plaintiffs allege that the defendant then realized that it could help solve the problem by connecting a large water user and waste generator to the RCI. Id. at ¶73. They say this led the defendant to Strauss, at the time the largest water user in the city with an already existing slaughterhouse in a different space. Id. at ¶74. The defendant allegedly proposed to Strauss that it should relocate its slaughterhouse to a site inside of the TID where it could build a

14

much larger facility. Id. The plaintiffs assert that the defendant's meetings with Bear and Strauss took place with this intention in mind, with the defendant promising to provide funding for the additional rural infrastructure needed to accommodate the proposed relocated slaughterhouse. Id. at ¶75. They say that the defendant planned a new water tower—estimated to cost $16 million, funded "in large part" by taxpayers—to support the large amount of water the slaughterhouse would need. Id. at ¶76. The plaintiffs assert that the defendant created this scheme to "avoid accountability for the improper development of the RCI and in particular to avoid accountability for the assurances made by the [defendant] when it obtained the $27 million in funds to have the RCI constructed." Id. at ¶77.

The plaintiffs maintain that the defendant intends to proceed with the overall plan even without Strauss, "indicating that [the defendant] has a different and improper motive for doing so that is contrary to merely neutrally regulating land use in the [defendant's] territory." Id. at ¶78. They say that the defendant was the driving force behind the slaughterhouse project from the beginning. Id. They say that the defendant is refusing to provide public records relating to its own actions surrounding the slaughterhouse project, arguing that several plaintiffs have made records requests that were not responded to in full. Id. at ¶¶80-81. The plaintiffs say they initiated this suit "to compel production of those records." Id.

## II. Analysis

The defendant has moved to dismiss the amended complaint an the grounds of lack of standing, ripeness, abstention, statute of limitations and failure to state a claim.

A.     Standing

The defendant makes three arguments relating to standing: (1) the plaintiffs have not suffered an injury in fact, (2) the plaintiffs do not have taxpayer standing and (3) the plaintiffs do not have third-party standing. Dkt. No. 19 at 10-16.

1.     *Injury in Fact*

Article III standing is an "essential component of Article III's case-or-controversy requirement," and therefore a "threshold jurisdictional question." Apex Digital, Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 443 (7th Cir. 2009) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Raines v. Byrd, 521 U.S. 811, 818 (1997). "Standing to sue is part of the common understanding of what it takes to make a justiciable case." Id. "Standing is an element of subject-matter jurisdiction in a federal civil action . . ." Moore v. Wells Fargo Bank, N.A., 908 F.3d 1050, 1057 (7th Cir. 2018).

> The "irreducible constitutional minimum of standing contains three requirements. *Lujan v. Defenders of Wildlife*, *supra*, at 560 . . . First and foremost, there must be alleged (and ultimately proved) an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas*, [495 U.S. 149], at 149,155 [1990] (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101-102 . . . (1983)). Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 . . . (1976). And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury. *Id.*, at 45-46 . . .; see also *Warth v. Seldin*, 422 U.S. 490, 505 . . . (1975). This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party

16

invoking federal jurisdiction bears the burden of establishing its existence. See *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 . . . (1990). Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 102-04 (1998).

Regarding the "injury in fact" leg of the triad, the injury must be "concrete—it must be "real," not "abstract." Spokeo, Inc. v. Robins, 578 U.S. 330, 339-40 (2016) (citations omitted). The injury also must be "particularized," such that it "affect[s] the plaintiff in a personal and individual way." Id. at 339.

Defendants may raise both a factual and a facial attack against standing. "[W]hen considering a motion that launches a factual attack against jurisdiction, "'[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact such subject matter jurisdiction exists.'" *Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008) . . . " Apex Digital 572 F.3d at 444. "[T]he court may consider and weigh evidence outside the pleadings to determine whether it has power to adjudicate the action." Bazile v. Finance Sys. of Green Bay, Inc., 983 F.3d 274, 279 (7th Cir. 2020) (citing Venezuela v. Helmerich & Payne Int'l Drilling Co., ___ U.S. ___, 137 S. Ct. 1312, 1316 (2017)). Alternatively, a facial attack "tests whether the allegations, taken as true, support an inference that the elements of standing exist," a factual attack tests "the existence of jurisdictional facts underlying the allegations." Id.

The defendant makes a factual attack on standing, arguing that the plaintiffs' alleged injuries are conjectural and hypothetical. Dkt. No. 19 at 13. It argues that the plaintiffs allege a future harm if the slaughterhouse is built near their properties. Id. The defendant insists that this fails to allege a concrete and particularized injury; it further asserts that because Strauss has withdrawn its application for a special use permit, there is no likelihood of future harm. Id.

The plaintiffs respond that they have suffered an injury in fact. Dkt. No. 24 at 9-10. They assert that when standing is being challenged, the court must presume all allegations as true and that they may demonstrating standing simply by clearly pleading allegations that "plausibly suggest" the elements of standing when the court draws all reasonable inferences in their favor. Id. at 8-9 (citing Spuhler v. State Collection Servs., 983 F3d 282, 285 (7th Cir. 2020)). They argue that they "are being injured and will be further injured economically as TID#6 and the slaughterhouse property are further developed." Id. at 10. The plaintiffs base this assertion on the expert report which they assert confirms a diminution in the value of their properties because of the defendant's conduct in adopting the TID and forcing a slaughterhouse to be built. Id. at 9. They assert that the report also shows that they are being injured by having to pay higher property taxes because of TID 6. Id. As to the associations, the plaintiffs say that each member of each association has standing, giving the associations, themselves, standing. Id. at 10 (citing Safe Skies Clean Water Wis. v. Nat'l Guard,  578 F. Supp. 3d 998, 1005-06 (W.D. Wis. 2022)).

The defendant replies that the plaintiffs' vague allegations of economic harm are insufficient. Dkt. No. 25 at 2 (citing Love Church v. City of Evanston, 896 F.2d 1082 (7th Cir. 1990)). It contends that the plaintiffs have not alleged specific facts regarding disruption to their quiet enjoyment of their property and repeats its arguments from its initial brief. Id. at 2-3.

The plaintiffs are correct that in Spuhler v. State Collection Service, Inc., the Seventh Circuit stated that "[i]nitially, a plaintiff my demonstrate standing by clearly pleading allegations that 'plausibly suggest' each element of standing when all reasonable inferences are drawn in the plaintiff's favor." Spuhler, 983

F.3d at 285 (citing <u>Silha v. ACT, Inc.</u>, 807 F.3d 169, 173-74 (7th Cir. 2015)). But the plaintiffs ignore the next sentence: "But if a plaintiff's standing is questioned as a factual matter—for example, in a motion to dismiss under Rule 12(b)(1)—the plaintiff must supply proof, by a preponderance of the evidence or to a reasonable probability, that standing exists." <u>Id.</u> The defendant has moved to dismiss on the ground (among others) that the plaintiffs have not alleged injuries in fact, so <u>Spuhler</u> requires that they "supply proof, by a preponderance of the evidence or to a reasonable probability," that demonstrates all three elements of standing.

The plaintiffs have not presented such proof. The individual homeowners each allege that based on their home's proximity to the proposed slaughterhouse, "development of that facility *if allowed to proceed* pursuant to the SUP/CUP and TID 6 *will* intrude and disrupt the quiet enjoyment of, diminish the value of, and cause direct and material injury and harm to their private residential property." Dkt. No. 14 at ¶¶4-10, 13-14 (emphasis added). The plaintiffs say the same about the property owners represented by the three association plaintiffs and FCA. <u>Id.</u> at ¶¶2-3, 11-12. These are, as the defendant asserts, allegations of *future* harm that will come to fruition only if the slaughterhouse is built.

The plaintiffs allege that their expert analysis demonstrates the negative impact of the slaughterhouse on nearby properties. <u>Id.</u> at ¶25 (citing Dkt. No. 1-4). The purpose of the report was "to determine whether proximity to an Animal Operation use, including slaughterhouse/meat processing facilities, has an impact on nearby property values." Dkt. No. 1-4 at 2. The expert, CohnReznick LLP, performed the analysis at the plaintiffs' request— specifically, FCA—with the intention of "gain[ing] an understanding of how

19

these uses *may* impact proximate property values." Id. (emphasis added).

CohnReznick found that "[b]ased on the information we have gathered to date,

*there is a reasonable and probable risk* of negatively impacting residential

property values *as a result of the development of the proposed AO facility*." Id. at

3 (emphasis added). It concluded that "[c]onsidering all of the preceding, the

data indicates that slaughterhouse facilities do have a negative impact on

proximate property values." Id. The report includes an estimate, filed in a

separate document, of the calculated "conservative" loss to property value in

Franklin and Muskego *"if a slaughterhouse would be built* on the Loomis Rd

Property in Franklin near the Muskego border." Dkt. No. 13-4 at 3 (emphasis

added).

 A future injury will satisfy Article III's standing requirements if the injury

is "certainly impending—in a word, imminent." Prosser v. Becerra, 2 F.4th 708,

714 (7th Cir. 2021) (citing Lujan, 504 U.S. at 564 n.2). "The Supreme Court

has 'repeatedly reiterated that threatened injury must be certainly impending

to constitute injury in fact, and that allegations of possible future injury are

not sufficient.'" Id. (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409

(2013)).

 There is no imminent threat to the value of the plaintiffs' properties. The

allegations in the amended complaint and the analyses and conclusions in the

expert report show that the plaintiffs are likely to suffer harm to their property

values and enjoyment of their homes if the slaughterhouse is built—a condition

that is not imminent given Strauss's withdrawal of its application for a special

use permit. While "[a] demonstrable reduction in the market value of one's

property is an injury in fact for standing purposes," Kathrein v. City of

Evanston, Ill., 636 F.3d 906, 914 (7th Cir. 2011), that harm will occur only if

the slaughterhouse is built. With no one seeking a permit to build a slaughterhouse, the future harm is not imminent.

        2.   *Taxpayer Standing*

The defendant argues that the plaintiffs do not have standing as taxpayers without a concrete and particularized actual or imminent injury. Dkt. No. 19 at 13-14 (citing <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 342-46 (2006)). The defendant points out that several of the plaintiffs do not pay taxes to the defendant. <u>Id.</u> at 14 (citing Dkt. No. 14 at ¶¶11-14).

The plaintiffs respond that they have taxpayer standing. Dkt. No. 24 at 9-10. They argue that they are paying[2] higher taxes because of the TID and the tax exemptions the defendant gave to the property owners of the TID. <u>Id.</u> at 9-10 (quoting Dkt. No. 14—the expert report—at ¶105).

As with their claims about the injuries resulting from the creation of the TID and the putative slaughterhouse project, the plaintiffs have alleged only future harm. The amended complaint does not mention taxes until ¶76 (out of 108), when it alleges that the planned construction of a new water tower is "estimated to cost $16 million," which "*will* be borne in large party by City tax payers including the Plaintiffs." Dkt. No. 14 at ¶76 (emphasis added). The amended complaint asserts that the plaintiffs have obtained information indicating that the president of Strauss confronted the mayor and other city officials and "demanded that Strauss be relieved of future property tax burdens

---

[2] The plaintiffs assert in their *brief* that they "are"—present tense—paying more in taxes. They assert that their "property in the form of taxes used to subsidize TID#6 has already been taken." Dkt. No. 24 at 12. But the *amended complaint* does not allege that the plaintiffs currently are paying higher taxes as a result of the TID or the now-stalled slaughterhouse project. Nor does the amended complaint allege that the plaintiffs' property in the form of taxes already has been taken. The amended complaint references only tax burdens that will be imposed in the future.

21

. . . ." Id. at ¶79. But it does not indicate that the defendant agreed to that demand, and again, Strauss has pulled out of the slaughterhouse project. The third claim for relief alleges that the defendant did all this knowing that the plaintiffs "and other tax payers *would be required* to pay more in property tax to cover costs of infrastructure and other expenditures incurred by [the defendant] to assist in the development of lands in TID 6 for the benefit of" Bear, Strauss and others. Id. at ¶104 (emphasis added). It says that these "taxes . . . *would* directly take and convert property of the Plaintiffs . . . ." Id. at ¶105 (emphasis added). All these allegations predict future tax burdens contingent on certain events occurring—events which appear unlikely to occur in the immediate future given Strauss's withdrawal from the project.

Beyond that, the mere fact of being a taxpayer does not suffice to create standing to sue. "[A]bsent special circumstances . . . standing cannot be based on a plaintiff's mere status as a taxpayer." Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 134 (2011). "[C]laims of taxpayer standing rest on unjustifiable economic and political speculation." Winn, 563 U.S. at 136. The fact that a government spends money from its coffers does not mean that it will inherently raise taxes on its citizens. See id. ("When a government expends resources or declines to impose a tax, its budget does not necessarily suffer. . . . To find injury, a court must speculate 'that elected officials will increase a taxpayer-plaintiff's tax bill to make up a deficit.'") (quoting DaimlerChrysler, 547 U.S. at 344). The plaintiffs have alleged, with no proof, that the defendant's plan (which, at the moment, appears to be on hold) will require them to pay more taxes in the future. They have not alleged or presented evidence showing that the defendant planned to increase property taxes or that it has increased property taxes.

22

3.    *Third-Party Standing*

"When . . . enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third-party standing has been held to exist." U.S. Dep't of Labor v. Triplett, 494 U.S. 715, 720 (1990) (citing Secretary of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 954-58 (1984)).

The defendant argues that the plaintiffs lack third-party standing, specifically regarding the RCI. Dkt. No. 19 at 15. It asserts that the plaintiffs have not demonstrated that they are parties to the RCI or that its terms benefit them. Id. at 16.

The plaintiffs did not respond to this argument and it does not appear that they are relying on the doctrine of third-party standing in asserting their claims.

B.    Dismissal

The facts alleged in the amended complaint do not support the plaintiffs' claims that they have standing and the plaintiffs have not presented proof that they have standing. Because the plaintiffs do not have standing, the court does not have subject matter jurisdiction. The court will grant the defendant's motion to dismiss under Rule 12(b)(1). Because the court is dismissing the case for lack of standing, the court cannot rule on the other bases for the defendant's motion.[3]

_____

[3] If the court had had jurisdiction to rule on the defendant's ripeness argument, it would have been hard-pressed to find that the plaintiffs had met the second prong of the ripeness evaluation—demonstrating the hardships they faced were this court not to make a decision. See Abbott Labs. v. Gardner, 387 U.S. 136,

23

### III.    Conclusion

The court **GRANTS** the defendant's motion to dismiss. Dkt. No. 17.

The court **ORDERS** that this case is **DISMISSED WITHOUT PREJUDICE** under Fed. R. Civ. P. 12(b)(1) for lack of standing. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 28th day of February, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

---

149 (1967); Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003).